UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

MARK ANTHONY GOWENS,

                    Petitioner,                              Case No. 1:16-cv-1334

v.                                                           Honorable Robert J. Jonker

SHERRY BURT,

                    Respondent.
_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254.

Petitioner Mark Anthony Gowens is incarcerated with the Michigan Department of Corrections at

the Muskegon Correctional Facility (MCF) in Muskegon, Michigan. On May 4, 2012, an Allegan

County Circuit Court jury found Petitioner guilty of two counts of third-degree criminal sexual

conduct (CSC III). On July 23, 2012, the court sentenced Petitioner as a fourth-offense felony

offender, MICH. COMP. LAWS § 769.12, to two prison terms of 18 to 30 years.

On October 27, 2016[1], Petitioner filed his habeas corpus petition raising two

grounds for relief, as follows:

> I.  WHETHER PETITIONER'S TRIAL COUNSEL WAS
> CONSTITUTIONALLY INEFFECTIVE. WHERE IT HAS BEEN
> DEMONSTRATED THAT COUNSEL'S PERFORMANCE FELL
> BELOW AN OBJECTIVE STANDARD OF REASONABLENESS, AND

---

[1] Under Sixth Circuit precedent, the application is deemed filed when handed to prison authorities for mailing to the federal court. *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002). For purposes of this Report and Recommendation, I have given Petitioner the benefit of the earliest possible filing date. *See Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (holding that the date the prisoner signs the document is deemed under Sixth Circuit law to be the date of handing to officials) (citing *Goins v. Saunders*, 206 F. App'x 497, 498 n.1 (6th Cir. 2006)).

ABSENT SUCH ERRORS, THE OUTCOME OF THE TRIAL WOULD HAVE BEEN DIFFERENT.

II.  WHETHER PETITIONER WAS INCORRECTLY SCORED OV 11 AND SHOULD BE REMANDED FOR RESENTENCING WITHIN A LOWER GRID.

(Pet., ECF No.2, PageID.18.)  Respondent has filed an answer to the petition (ECF No. 7) stating that the grounds should be denied because they are noncognizable and/or without merit.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that Ground I of the petition lacks merit and Ground II is not cognizable on habeas review.  Accordingly, I recommend that the petition be denied.

## **Discussion**

I.    Factual allegations

Petitioner's convictions arose from two separate incidents over the course of the night of September 29-30, 2011, during which the sleeping victim woke twice to find Petitioner committing penile-vaginal penetration.  Petitioner originally was charged with four counts of CSC III and one count of assault with intent to commit sexual penetration.  In addition, the prosecutor filed a notice that the Petitioner was a fourth felony offender under the habitual offender act.  At the preliminary examination held on November 9, 2011, the prosecutor moved to amend the information, to remove the theory of force and coercion, and replace it with physical helplessness on counts 1 and 2 of CSC III, as well as altering count 3 to reflect digital penetration. The court agreed to the amendment of counts 1 and 2 and bound Petitioner over on those counts, but it dismissed the remaining two counts of CSC III (counts 3 and 4), as well as count 5, for assault with intent to commit sexual penetration.  (Prelim. Exam. Tr., ECF No. 8-2, PageID.153-154.)

Petitioner was tried before a jury over the course of four days, from May 1, 2012, through May 4, 2012.[1]  Lisa Vissers testified that she was 44 years old and had two adult children, Jimmy Hitchcock (27) and Evelyn Hitchcock (21).  On the night of September 29-30, 2011, Vissers lived in a two-bedroom trailer home with another woman, Casey Plummer, to whom she paid rent. The trailer park was across the street from a Family Dollar store, and she had previously met Petitioner in the store's parking lot, but they were not friends.  (T. Tr. I, ECF No. 8-5, PageID.317-318, 320-22.)  Vissers walked home from her job at Allegan Metal Finishing, arriving at about 8:40 p.m.  When she arrived, a car was outside the trailer.  Petitioner jumped out, while another man remained inside the car.  (*Id*, PageID.322-323.)  Petitioner indicated that he wanted to come inside, but Vissers told Petitioner that she had to do a Western Union transfer for one of her grandchildren. Vissers was carrying a box containing items she had removed from her work locker. When she put the box inside, she had to be forceful to prevent Petitioner from entering the trailer. (*Id.*, Page.ID.326.)  Vissers testified that she did not feel comfortable with Petitioner, as he had previously watched and followed Vissers and Plummer while they were shopping at Family Dollar. Vissers had told Plummer that she did not want Petitioner at the trailer, because she was not comfortable, but Plummer told her that it was her trailer and she could have him there if she wanted.  (*Id.*, Page.ID.324-325.)  Vissers went next door to get a ride to Western Union, and she was gone for about 10 or 15 minutes.  When she came home, Plummer was in the house with Petitioner and a man named "John," and all of them were drinking.  (*Id.*, PageID.327.)  Vissers

---

[1] Trial transcripts included the four main days of trial, as well as some excerpted portions reproduced separately.  The Court will reference the trial transcripts as follows:

| | |
|---|---|
| Transcript for May 1, 2012: | (T. Tr. I, ECF No. 8-5, PageID.___); |
| Transcript for May 2, 2012: | (T. Tr. II, ECF No. 8-8, PageID.___); |
| First Suppl. Transcript for May 2, 2012: | (T. Tr. IIA, ECF No. 8-6, PageID.___); |
| Second Suppl. Transcript for May 2, 2012: | (T. Tr. IIB, ECF No. 8-7, PageID.___); |
| Transcript for May 3, 2012: | (T. Tr. III, ECF No. 8-9, PageID.___); |
| Transcript for May 4, 2012: | (T. Tr. IV, ECF No. 8-10, PageID.___). |

began to play on the desktop computer that was in the living room.  (*Id.*, PageID.328.)  Petitioner

was sitting on the couch near Vissers, and Plummer and John were in the kitchen drinking.  (*Id.*,

PageID.329.)  While she was on the computer, Petitioner kept trying to hold her hand.  She pulled

her hand back repeatedly.  (*Id.*, PgeID.330.)  Later in the evening, she went to her bedroom to get

things for her bath, but Petitioner followed her in the bedroom, so she gave up.  She put her things

in the bathroom, but went back to the living room to play on the computer.  (*Id.*, PageID.333, 336,

371.)  Petitioner again tried to hold her hand and tried to get her to sit on the couch.  (*Id.*,

PageID.333.)  Every time Vissers got up to get something to drink or to do anything, Petitioner

followed her.  (*Id.*, PageID.337.)  None of the room doors inside the trailer had locks on them.

(*Id.*, PageID.319, 336.)  Vissers explained that she had not had any alcohol, because she was on a

number of medications, including three seizure medications.  (*Id.*, 334.)  Vissers gave a number of

responses about when she took her seizure medications:  1:00 or 2:00 p.m. and 9:00 p.m. (*Id.*,

PageID.334, 341); 9:00 a.m, 3:00 p.m., and 9:00 p.m. (*Id.*, PageID.390, 392, 419); 1:00 a.m. (*Id.*,

PageID.418.)  Vissers testified that she did not smoke, did not allow others to smoke in her room,

and did not know how the cigarette butts that were in her room got on the floor.  (*Id.*, PageID.335,

368.)  She testified that Plummer saw everything, but that Plummer was drinking heavily and

became very drunk by 1:00 or 2:00 a.m.  (*Id.*, PageID.337-339.)  Vissers asked Plummer a couple

of times to ask Petitioner to leave, but Plummer was too busy drinking.  At some point during the

evening Plummer wanted money for beer.  Vissers gave her $10.00, at which point John took

Plummer to the store.  Vissers remained at the trailer with Petitioner for 15 or 20 minutes.  She

played on the computer, and Petitioner watched television.  (*Id.*, PageID.339-340.)

Vissers' son, Jimmy Hitchcock, came over at around 10:00 or 10:30 p.m.  Vissers

usually went to bed at about 9:00 p.m., after taking her pills, because they make her really sleepy.

On this night, she took her pills at 9:00 p.m., but, because of the noisy company and music, she was up and stayed up to visit with her son.  (*Id.*, PageID.340-341, 344-345,419.)  After a while, because her son was there, she again tried to take a bath.  When she was still in the bathroom, getting dressed after her bath, Petitioner walked in without knocking, again making her uncomfortable.  Vissers told him to get out, which he did.  (*Id.*, PageID.341-343.)  Vissers went into the bedroom, shut the door, and got into her single bed.  (*Id.*, PageID.344.)  She had a hard time sleeping because of the noise, despite asking several times to have the radio turned down. She ended up going to sleep at about 2:00 a.m., and she slept heavily because of the drugs.  (*Id.*, PageID.345-346.)  The next thing Vissers knew, she woke up, lying on her stomach, to find Petitioner on top of her, with his penis in her vagina.  She told him to stop and pushed him off. Petitioner apologized and left the room.  (*Id.*, PageID.346-347.)  She realized that her underwear and pajama bottoms were on the floor, so she pulled them back on.  (*Id.*, PageID.347.)  Vissers testified that she felt nasty and dirty.  She rolled up in a blanket, trying to sleep.  She was embarrassed to tell anyone, so she was not going to report it.  (*Id.*, PageID.349-350.)  Vissers fell asleep crying and awoke at about 4:30 a.m. to find herself on her back, with Petitioner on top of her with his penis in her vagina.  Her pajamas were again off and at the end of her bed.  (*Id.*, PageID.351.)  Vissers pushed Petitioner off of her.  Petitioner again said he was sorry and left. (*Id.*, PageID.352-353.)  Vissers grabbed her clothes and went to the bathroom to get dressed for work, though it was an hour earlier than she usually arose.  (*Id.*, PageID.353.)  She remained in the bathroom for quite a while.  (*Id.*, PageID.403.)  She subsequently woke Plummer for work, told Plummer she was leaving, and left the trailer.  (*Id.*, PageID.353.)  She intentionally did not shower that morning, as she knew that she should preserve evidence if she reported the crime.

5

Vissers testified that she did not have a cell phone with her in the bedroom, as she kept it in her purse, which was in the kitchen.  (*Id.*, PageID.353-354, 356.)

Visser went to work, where she remained until about 11:00 a.m.  At that time, a man she worked with touched her shoulder and she "lost it."  (*Id.*, PageID.354.)  Fellow workers told her boss that she was "flipping out," and she was instructed to talk to her supervisor.  (*Id.*)  She told her boss what had happened, and they sent her home.  (*Id.*, PagerID.354, 359.)  As she was walking back to the trailer, she called her son, who was sleeping in Plummer's room, and told him what was going on.  (*Id.*, PageID.359-360.)  Vissers did not know if Petitioner was still at the trailer and asked her son to check.  Her son went across the road, got her neighbor John (Ryan) Eldridge, and looked in Vissers' bedroom, finding Petitioner in her bed.  (*Id.*, PageID.361-362.)  Vissers ultimately decided to walk to her grandson's mother's home about 45 minutes away, rather than going home.  (*Id.*, PageID.359-360.)  Once there, Vissers called the police.  Detective Mendell talked to her and then took her to the Center for Women in Transition in Holland, where she had a rape examination.  (*Id.*, PageID.362-364.)  Vissers did not go home that night, but instead stayed with someone else.  (*Id.*, PageID.365.)  Vissers testified that, since the events of September 30, 2011, she had been stressed out and depressed.  (*Id.*, PageID.373.)

The court also heard testimony from John Eldridge, who lived across the street from Vissers.  On the morning of September 30, 2011, Jimmy Hitchcock came over to ask Eldridge for help getting someone out of the house.  Eldridge woke a man named "Mark," and told him that the people who lived there wanted him to leave.  The man was sleeping on Vissers' bed, wearing pants, but no shirt.  The man stated that "Junior" was supposed to wake him earlier, because he had to work.  (T. Tr. II, ECF No. 8-8, PageID.480-482.)

Jimmy Hitchcock, Vissers' 27-year-old son, testified that his father dropped him at the trailer occupied by Casey Plummer and his mother between 9:30 and 10:00 p.m.  After he had been there for a half hour, Petitioner and John arrived.  (*Id.*, PageID.486-487.)  He was familiar with Petitioner and thought that his mother had gone to high school with Petitioner.  (*Id.*, PageID.487, 509.)  Hitchcock saw his mother drink some portion of a beer.  (*Id.*, PageID.488.)  He, Plummer, and John went to get more beer sometime later, leaving his mother and Petitioner alone for 15 minutes.  His mother was acting like she did not want to be close to Petitioner.  She spent most of the night at the computer, but Petitioner stared at her and every time she got up, he would follow her.  (*Id.*, PageID.490-491.)  According to Hitchcock, they all drank beer, but Petitioner, John, and Casey also used some pills and marijuana.  Hitchcock saw Petitioner repeatedly put his hand on her leg and saw her indicate that it was bothering her.  (*Id.*, PageID.493-496.)  At about 11:30 p.m. or 12:00 a.m., Vissers got ready to go to bed, and went into the bathroom to take a bath.  After the bath, she told the others that she was going to bed because she had to work in the morning.  (*Id.*, PageID. 497-498.)  Petitioner and John indicated that they were going to leave.  John left a little later, and Petitioner said he was leaving about 20 minutes later.  Hitchcock did not see him leave.  (*Id.*, PageID.498-499.)  Hitchcock went into Plummer's bedroom to go to sleep, but Plummer was still up, though she was very intoxicated and stumbling around.  (*Id.*, PageID.500.)  Hitchcock saw that his mother's door was closed.  The next morning when he woke up, he saw that he had a voice mail from his mother, saying that he needed to call her because it was an emergency.  He called her, and she told him everything that had happened.  She was upset, did not want Hitchcock to go back in the house, and asked him to get Eldridge to see if Petitioner was still there and, if so, to get him to leave.  (*Id.*, PageID.502-504.)  After he had done as his mother requested, Petitioner stayed at Eldridge's trailer.  He then walked to meet her at

work, after which they went to his ex-girlfriend's house.  (*Id.*, PageID.507.)  Hitchcock stayed

when his mother called the police.  She was crying and scared.  (*Id.*, PageID.508.)  Defense counsel

asked the following question:

> Q.    Your mom had testified that one of the reasons you didn't stay around with Mark because you were on probation and you weren't supposed to be around Mark. Is that correct? . . . You were on probation at the time?
>
> A.    Yes.
>
> Q.    You weren't supposed to be using alcohol or be around certain individuals?
>
> A.    No.

(*Id.*, PageID.510-511.)  Shortly thereafter, on redirect, the prosecutor asked a follow-up question:

> Q.    Okay.  The defense attorney asks you you're on probation so you're not supposed to be around Mark.  Why not?
>
> A.    I'm thinking because he's got a felony.

(*Id.*, PageID.512.)  The exchange elicited a prompt defense objection, leading to a side bar, which

was not recorded.  Following the side bar, no further questions were asked and no instruction was

given to the jury.  (*Id.*, PageID.512-513.)

Lisa Sweet testified as the expert sexual assault nurse examiner who saw Vissers at

the Center for Women in Transition on September 30, 2017.  (*Id.*, PageID.536.)  She testified to

the history provided by Vissers, which roughly paralleled Vissers' testimony.  (*Id.*, PageID.538-

539.)  Sweet found some small bruises on Vissers' legs, she found no injuries to Vissers' genitalia.

Sweet testified that she was not surprised by the absence of injury, as the lack of injury is common.

(*Id.*, PageID.541, 548-49, 566-567.)  She took genital, anal, and oral swabs from Vissers, and she

swabbed the inside of Vissers's thigh just below the genitals.  (*Id.*, PageID.541-542.)

Michigan State Police DNA examiner Ann Hunt testified as an expert in forensic

DNA.  (*Id.*, PageID.579.)  Hunt testified that she examined the samples submitted in the case and

found no evidence of seminal fluid or sperm cells.  (*Id.*, PageID.586.)  However, on the sample taken from Vissers' thigh and labia swabs, she found evidence of saliva.  (*Id.*, PageID.587.)  Hunt analyzed the swabs taken from Vissers' thigh and labial areas and found DNA on the thigh swab that matched both Vissers and a male donor.  She subsequently matched that male donor to the buccal sample taken from Petitioner to a likelihood of 1 in 9.452 quadrillion African-American males.  (*Id.*, PageID.588-590.)

Janet Hinesley testified that in 1998, she was at a party that started at a pub and continued at the house of her friend, Amy Rock.  Petitioner was not invited, but he walked over. He stayed until everyone else left, and he did not want to leave when asked. Hinesley was staying overnight at her friend's house.  (*Id.*, PageID.607-608.)  Petitioner introduced himself to Hinseley, and she learned that he had gone to Allegan High School, as had she, but in a different class. Petitioner repeatedly "put the moves on [her]," but she continuously refused.  (*Id.*, PageID.609.) Everyone, including Hinesley, was drinking a lot.  At about 2:00 or 3:00 a.m., Rock and Hinesley tried to get Petitioner to leave, so that they could go to bed.  Rock had to work in the morning. Petitioner said he was leaving and slammed the door.  Rock was in the bathroom, but immediately came out and locked the door.  Hinseley had already laid down on the couch, where she planned to sleep.  After they believed Petitioner had left, Hinesley fell asleep.  She awoke later to find Petitioner on top of her, penetrating her vagina with his penis.  Hinesley told Petitioner to stop and tried to push him off, and he stopped.  (*Id.*, PageID.610-611.)  She sat up and covered herself with a blanket.  Petitioner walked back and forth saying, "[I]t's alright, right?  Everything is cool between us, right? . . . [Y]ou're not going to tell anybody, right?"  (*Id.*, PageID.612.)  Hinesley said that she agreed with him, but she just wanted him to leave.  She did not tell anyone for a couple of days, as she was embarrassed, feeling like she should have fought him harder.  (*Id.*)  She

finally told Rock, who wondered how Petitioner got back in.  Hinesely believed that Petitioner had hidden under the bed, as Rock's boxes and coats that had been under the bed were pushed back to the wall.  (*Id.*, PageID.613-614.)  Hinesley eventually told the police and participated in the intial stages of prosecuting Petitioner, but because her family did not support her, she subsequently moved away from the area.  (*Id.*, PageID.615.)  Hinesley knew who Vissers was since high school, but she did not know Vissers well.  (*Id.*, PageID.615-616.)  On cross-examination, Hinesley's timeline and account were significantly impeached.  (*Id.*, PageID.618-620, 629-630.)  She testified to having had a brain injury since that time and could not remember what she told police.  She reaffirmed, however, that she remembered the details of being raped.  (*Id.*, PageID.631-632.)

After hearing extensive arguments from counsel about the admissibility of Petitioner's recorded interrogation with the police, the court admitted the videotape of Petitioner's questioning.  (*Id.*, PageID.640-661.)  Eventually, the court determined the video was admissible, and, after discussion with his client, defense counsel waived any objection to the presentation of Petitioner in handcuffs, as they were hardly visible.  (*Id.*, PageID.657-661.)  The court indicated that it would give an instruction about the brief mention in the recording of Petitioner being on probation, but Petitioner waived that issue as well.  (*Id.*, PageID.661-662.)

The video of Petitioner's interview was played for the jury, after certain tehnical problems were overcome.  (*Id.*, PageID.662, 683; T. Tr. II(B), ECF No. 6-7, PageID.450-474.)  Petitioner told the police that Vissers had invited him to join her in bed and that they were cuddling.  Vissers could not sleep with the noise and people coming in.  She ran out and told people to be quiet.  Somewhat later, according to Petitioner, Vissers took a shower.  Petitioner went out to the front room for a while.  (T. Tr. II(B), ECF No. 8-7, PageID.453-454.)  When Vissers got out of the shower, Petitioner smoked a cigarette and they laid down together again.  They cuddled, but

she still complained about noise.  He went out to get them to quiet down.  Petitioner testified that they cuddled and kissed.  He was wearing boxers and she was in pajamas, and the next thing he knew they were waking up in the morning, with Vissers running late for work.  (*Id.*, PageID.454-455.)  Petitioner initially denied sexual penetration, but he later indicated that he took off his underwear to "grind" against her, and he later admitted that Vissers' pants were down.  (*Id.*, PageID.457, 467, 471-472.)  He also eventually admitted fingering her vagina.  (*Id.*, PageID.468, 470.)  He acknowledged that his penis might have slipped in and the examiners might find "precum."  (*Id.*, PageID.470.)  Still later in the interview, Petitioner admitted that Vissers at some point told him, "[N]ot right now[.]"  (*Id.*, PageID.473.)  Petitioner claimed that he immediately stopped.  He also stated that Vissers grabbed his penis and rubbed it once.  (*Id.*)

Patricia Haist, the Director of Clinical Services for the YWCA Counseling Center in Grand Rapids, testified as an expert in the field of sexual assault dynamics.  (T. Tr. II, PageID.667.)  Haist testified that 80% of sexual assaults were perpetrated by offenders known to the victim.  She also indicated that only about 30% of such assaults were reported to the police, due to feelings of shame, fear of reprisals, and self-blame.  (*Id.*, PageID.667-668.)  She added that the trauma of assault also frequently affected memory.  (*Id.*, PageID.670.)

Former Allegan County Detective Patrick O'Reilly testified that he had interviewed Petitioner in relation to Janet Hinesley's allegations of sexual assault.  Petitioner told O'Reilly that he had been invited to the party and had permission to spend the night.  Petitioner stated that he had hugged and kissed Hinesley, and that he had left shortly thereafter.  He denied having sexually penetrated her.  (T. Tr. III, ECF No. 8-9, PageID.693-694.)

The defense introduced the testimony of Casey Plummer.  Lisa Vissers lived with Plummer for about two months.  Plummer testified that she met Petitioner through Vissers, while

they were at the Family Dollar.  (*Id.*, PageID.709-710.)  On the night of September 29 to 30, 2011, she had a party at her house that started about the time Vissers got out of work.  The party included Petitioner, Jimmy and a male friend, Vissers, and Plummer.  Everyone was drinking, though Vissers only had one beer.  (*Id.*, PageID.711.)  Petitioner had come to the house twice before while Vissers was at work.  Plummer invited him in and talked with him one time and refused to let him in another time.  (*Id.*, PageID.712, 732-733.)  Plummer testified that Vissers said that she knew Petitioner in high school, but the response was stricken and the jury was told to ignore it.  (*Id.*, PageID.712-713.)  Petitioner and Plummer started socializing before Vissers got out of work.  Vissers' son came later.  She left with one of the others to get more beer.  (*Id.*, PageID.714-715.)  Vissers was talking with Petitioner and playing on the computer.  Plummer went to bed at about 2:00 or 2:30.  Plummer knew that Petitioner was in Vissers's room, because she walked in at about that time and saw them sitting on Vissers' bed, fully dressed, talking, and she joined them briefly.  (*Id.*, PageID.715-716.)  She saw no kissing or cuddling.  (*Id.*, PageID.728.)  Plummer went to bed at about 3:00 or 4:00 a.m.  Vissers' son slept overnight in Plummer's bed, but they were not dating.  (*Id.*, PageID.716.)  Vissers never woke Plummer, but Plummer left for work early in the morning.  Both Petitioner and Jimmy were still in the trailer when she left.  (*Id.*, PageID.717.)  Plummer admitted yelling at Petitioner later that day, because she did not realize that he had stayed in the house overnight.  (*Id.*, PageID.728, 740-741.)  Plummer testified that she had not spoken to Vissers since the night of the party, because she no longer liked her.  (*Id.*, PageID.729.)  Plummer denied doing drugs that evening, but then admitted that she did not remember everything, as she was tipsy.  (*Id.*, PageID.736-737.)  She also admitted that she took psychotropic medications for depression, but did not take them that night because she was drinking.  (*Id.*, PageID.724-725.)

The court asked additional questions of Plummer outside the presence of the jury, in which she stated that she did not believe in the rape because Vissers liked to start problems with people, as she did with Plummer's cousin when she dated him.  (*Id.*, PageID.740-742.)  The court then heard extensive arguments outside the presence of the jury about the admissibility of Plummer's theft convictions in 2008 and 2009 on crimes of dishonesty, and her accepted plea of not guilty by reason of insanity in 2010, for which she was not convicted but was involuntarily committed.  (*Id.*, PageID.744-756.)  The court ruled that the convictions were admissible.  (*Id.*, PageID.757.)  The court ruled that it had permitted the defense's late addition of Plummer as a witness on the first day of trial and that it was not going to prejudice either party at this juncture because they had no ability to do a complete investigation.  The court found that Plummer had waived her HIPPA privilege by her prior statements to police that she had schizophrenia, that she had not taken her medications, and that she was hearing voices.  The court also held that the privilege was waived by her plea of not guilty by reason of insanity and the court's finding to that effect.  (*Id.*, PageID.762-764.)  Before the jury, Plummer at first denied hearing voices when not taking her medication, but she admitted to the 2010 statements to police.  (*Id.*, PageID.766-767.)  She also acknowledged convictions in both 2008 and 2009 on two different thefts of a motor vehicle.  (*Id.*, PageID.767.)

John Beck testified that he was with Petitioner on September 29, 2011, and they went to the house of a friend of Petitioner.  They arrived at about 8:00 p.m., and only one woman was there at first.  A second woman arrived, followed by her son.  (*Id.*, PageID.771-772.)  He left the house at 2:00 a.m.  Everyone was drinking, except the second woman.  During the course of the night, he left the trailer twice.  First, he and the first woman left the house to get money from his apartment and buy a 12-pack of beer.  They were gone for 45 minutes.  The second time, he,

the first woman, and the second woman's son went to get a 24-pack of beer at the Village Market. They were gone for 15 or 20 minutes.  (*Id.*, PageID.773-775.)  The second woman and Petitioner sat next to one another on the couch.  At about 9:00 or 9:30 p.m., the woman got up, followed by Petitioner, and they went into a room and shut the door.  They separately came out of the room multiple times.  Beck saw Petitioner in the hallway right before he left at 2:00 a.m.  He had not seen the woman for 30 or 45 minutes.  (*Id.*, PageID.775-776.)  The older woman and Petitioner seemed friendly, but he saw no kissing or other physical contact.  (*Id.*, PageID.782.)  Beck testified that everyone except the older woman was smoking marijuana.  The older woman was in her bedroom.  (*Id.*, PageID.785.)  The younger woman, Casey Plummer, was drunk and vomiting.  He had fought with Casey, trying to take the alcohol away, earlier that night.  Plummer was extremely intoxicated when he left.  (*Id.*, PageID.786.)

Following closing arguments and jury instructions, the jury deliberated for less than an hour before being excused for the day.  (*Id.*, PageID.840.)  The following morning, the jury asked to rehear Petitioner's police interview.  They also asked for the transcript of the testimony of Jimmy Hitchcock.  The court granted the first request and denied the second.  (T. Tr. IV, ECF No. 8-10, PageID.846-849.)  At 12:25 p.m. on May 4, 2012, the jury found Petitioner guilty on both counts of CSC III.  (*Id.*, PageID.851.)  On July 23, 2012, the court held a sentencing hearing. The scoring of the sentencing guidelines resulted in a minimum sentence range of 87 to 290 months' imprisonment and a maximum sentence of 50 years.  (Sentencing Tr., ECF No. 8-12, PageID.874, 877.)  The court sentenced Petitioner, as a fourth-offense felony offender, to a prison term of 216 months to 340 months.  (*Id.*, PageID.886.)

Petitioner appealed his convictions to the Michigan Court of Appeals, claiming that trial counsel was ineffective in failing to seek a cautionary instruction on Hitchcock's mention of

Petitioner's prior felony and claiming that the sentencing court had improperly scored Offense Variable (OV) 11.  The court of appeals concluded that trial counsel erred in not requesting a cautionary instruction after the victim's son mentioned that Petitioner had a felony.  The court, however, concluded that Petitioner could not show that the error was prejudicial.  It therefore rejected Petitioner's claim of ineffective assistance of counsel.  With respect to Petitioner's second issue on appeal, the court of appeals found that Offense Variable (OV) 11 was properly scored.  The court therefore affirmed the convictions and sentences.  (Mich. Ct. App. Op., ECF No. 8-13, PageID.891-893.)

Petitioner sought leave to appeal to the Michigan Supreme Court, raising the same two grounds.  In addition, Petitioner argued that trial counsel rendered ineffective assistance when he failed to remove from the police interview Petitioner's references to unpaid child support.  (Def.-Appellant's Appl. for Leave to Appeal, ECF No. 8-14, PageID.1083.)  In an order issued on January 28, 2014, the supreme court denied leave to appeal.  (Mich. Ord., ECF No. 8-14, PageID.1081.)

Petitioner filed a motion for relief from judgment or motion to vacate his sentence in the Allegan County Circuit Court on April 25, 2015, arguing that the fourth-habitual-offender notice was not properly filed and therefore could not be used to enhance Petitioner's sentence.  The court did not promptly decide that motion.  On or about September 16, 2015, Petitioner filed a habeas petition in this Court, raising the two grounds presented on direct appeal, together with the new issue raised in the Michigan Supreme Court.  *See Gowens v. Burt*, No. 1:15-cv-943 (W.D. Mich. Feb. 19, 2016) (ECF Nos. 13-15).   The Court dismissed the petition for lack of exhaustion, because Petitioner had failed to exhaust one of his claims.  The Court expressly advised Petitioner

of the requirement of exhaustion and of the state-court remedies available to him.  (No. 1:15-cv-943, ECF No. 13, PageID.62-66.)

Eight months later, Petitioner filed a motion for relief from judgment in Case No. 1:15-cv-943.  This Court denied the motion, but directed Petitioner's motion to be docketed as a new habeas petition.  The motion and proposed petition were subsequently filed in the instant habeas action.  (*See* No. 1:15-cv-943, ECF No. 18, PageID.137-138.)  In his new filing, Petitioner denied that he had filed a motion for relief from judgment in the state courts, and he never indicated that he had attempted to raise new claims of ineffective assistance of counsel in those courts.  (Pet., ECF No. 1, PageID.3.)  Two months after he filed the instant habeas action, Petitioner filed an amended motion for relief from judgment claiming that trial counsel was ineffective in failing to investigate and object to the admission of Hinesley's evidence, failing to engage an expert witness, and failing to introduce racial bias as the motive for the victim's report.  (Mot. to Am. Mot. for Relief from J., ECF No. 8-15, PageID.1105, 1112.)  Only upon receiving the Respondent's Rule 5 submissions did the Court learn that Petitioner had filed an amended motion for relief from judgment in the state court, in which he raised the new claims presented in his habeas petition.  According to the records of the Allegan County Circuit Court, that motion was denied on October 25, 2017.  Petitioner has not appealed the decision, though the time for filing an appeal has not yet expired.

II.     AEDPA standard

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on

the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to,

or involved an unreasonable application of, clearly established federal law as determined by the

Supreme Court of the United States; or (2) resulted in a decision that was based upon an

unreasonable determination of the facts in light of the evidence presented in the state court

proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v.

Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

      The AEDPA limits the source of law to cases decided by the United States Supreme

Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and

not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v.

Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly

established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135

S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not

include decisions of the Supreme Court announced after the last adjudication of the merits in state

court.  *Greene v. Fisher*, 565 U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the

legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court

precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642,

644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

      A federal habeas court may issue the writ under the "contrary to" clause if the state

court applies a rule different from the governing law set forth in the Supreme Court's cases, or if

it decides a case differently than the Supreme Court has done on a set of materially

indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy

this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being

presented in federal court was so lacking in justification that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

III.    Ground I:  Ineffective Assistance of Counsel

In his first ground for habeas relief, Petitioner contends, as he did on direct appeal, that his trial attorney rendered ineffective assistance of counsel when he failed to request a jury instruction advising the jury to disregard Jimmy Hitchcock's mention that Petitioner had a prior felony conviction.  Petitioner also adds new allegations of ineffective assistance of trial counsel: failing to investigate the lack of evidence supporting the prior criminal sexual assault allegations raised by Janet Hinesley; failing to object to Hinesley's testimony; failing to call an expert witness who would say that DNA would have been found if penetration had occurred; and failing to present evidence of racial bias by the victim's son.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To

establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

A.    Failing to request instruction on mention of felony

Petitioner's first claim of ineffective assistance of counsel – that trial counsel was

ineffective in failing to request or secure an instruction on Jimmy Hitchcock's mention that

Petitioner had a felony – was presented to both the Michigan Court of Appeals and the Michigan

Supreme Court.  The court of appeals addressed the issue as follows:

> Defendant first argues that he was denied effective assistance of counsel
> when his attorney failed to request a cautionary instruction regarding a reference to
> defendant's felony conviction.  At trial, the prosecution asked the victim's son, who
> was on probation, why he was not supposed to be around defendant.  The son
> responded, "I'm thinking because he's got a felony."  Defense counsel immediately
> objected, and defense counsel requested a bench conference.  The court ruled that
> the question and answer were inadmissible.  When the trial resumed, however, the
> court did not rule on the objection in front of the jury, and no cautionary instruction
> was given.

> To establish ineffective assistance of counsel, a defendant first "must show
> that counsel's performance was deficient," *People v Carbin*, 463 Mich 590, 600;
> 623 NW2d 884 (2001), meaning that "counsel's performance fell below an
> objective standard of reasonableness."  *People v Pickens*, 446 Mich 298, 338; 521
> NW2d 797 (1994).    Second, "the defendant must show that the deficient
> performance prejudiced the defense," and "[t]o demonstrate prejudice, the
> defendant must show the existence of a reasonable probability that, but for
> counsel's error, the result of the proceeding would have been different."  *Carbin*,
> 463 Mich at 600.

> Counsel was objectively unreasonable for failing to request a cautionary
> instruction.    Under MRE 404(b), evidence of prior convictions is generally
> inadmissible, and in the event the prosecution intends to introduce a conviction, it
> is required to provide "reasonable notice in advance of trial."  The prosecution did
> not give such notice and the trial court ruled correctly that the evidence was
> inadmissible.  After the trial resumed, defense counsel did not ensure that the trial
> court instructed the jury to disregard the victim's son's comment, even though the
> court never ruled on the objection in front of the jury.  This allowed the jury to
> consider the improper comment, and led to the reasonable conclusion that there was
> no problem with the answer elicited from the victim's son.

> Although defendant can establish that his counsel's performance was
> objectively unreasonable, defendant has not established the existence of a
> reasonable probability that "but for counsel's error, the result of the proceeding
> would have been different."  *Carbin*, 463 Mich at 600.  Sufficient evidence existed
> for defendant to be convicted disregarding defendant's felony reference.  The

victim testified that she awoke twice from sleeping and found defendant on top of her with his penis inserted into her vagina.  Because she was asleep both times, she was physically helpless, and because defendant's penis was inserted into her vagina both times, defendant committed two acts of sexual penetration.  This is sufficient evidence for defendant to be convicted of two counts of third-degree CSC.  MCL 750.520d(1)(c); *People v Lemmon*, 456 Mich 625, 643; 576 NW2d 129 (1998) ("It is a well-established rule that a jury may convict on the uncorroborated evidence of a CSC victim.").  Further, the jury heard testimony from an other-acts witness who testified that she was sexually assaulted in essentially the same manner as the victim in this case; thus, lending credence to the victim's testimony.    Contrary to defendant's assertion, *People v Anderson*, 446 Mich 392, 407; 521 NW2d 538 (1994), is inapplicable because the testimony in question did not have an "obvious prejudicial and inculpatory nature."  Additionally, defendant's actions, as described by the other-acts witness would constitute a felony and therefore, the brief vague reference by the victim's son to defendant having a felony conviction was harmless.  Thus, defendant has not established the existence of a reasonable probability that "but for counsel's error, the result of the proceeding would have been different."  *Carbin*, 463 Mich at 600.  Defendant simply has not met his burden of establishing ineffective assistance of counsel.  *Id.*

(Mich. Ct. App. Op., ECF No. 8-13, PageID.891-892.)  Although the Michigan Court of Appeals did not directly cite *Strickland*, 466 U.S. 668, the standard it applied was identical to the federal constitutional standard.  Moreover, the state cases on which the court of appeals relied, expressly draw their standard from *Strickland*.  *See People v. Carbin*, 623 N.W.2d 884, 889 (Mich. 2001) (applying *Strickland*, 466 U.S. 668); *People v. Pickens*, 521 N.W.2d 797, 808-10 (Mich. 1994) (holding that the Michigan constitutional standard for claims of ineffective assistance of counsel is identical to the federal constitutional standard set forth in *Strickland*, 466 U.S. 668).

The Michigan Court of Appeals held that counsel had rendered ineffective assistance by failing to ensure; (1) that the trial court ruled on his objection to Hitchcock's mention of the felony before the jury; (2) and that the court gave a cautionary instruction.  The court of appeals held, however, that Petitioner could not demonstrate the prejudice prong of the *Strickland* standard.  That determination was patently reasonable.  The victim provided clear testimony concerning the incidents that occurred.  Petitioner's own police statement, in which he moved from denying penetration to admitting that it might have occurred but was consensual, reinforced the

21

victim's credibility.  Further, Hitchcock affirmed in other testimony that his mother had expressed dislike of Petitioner's advances.  Moreover, Janet Hinesley's testimony about Petitioner's nearly identical conduct on a prior occasion reinforced the credibility of the victim's version.  In contrast, Hitchcock's mention of Petitioner's prior felony was brief and inconsequential in the context of the evidence produced against Petitioner.  Under these circumstances, Petitioner cannot overcome the double deference owed to the state court's finding that counsel's error was not prejudicial.  *See Harrington*, 562 U.S. at 105 (citing *Knowles*, 556 U.S. at 123).  Accordingly, Petitioner is not entitled to habeas relief on the claim.

B.     Unexhausted claims of ineffective assistance of counsel

As previously discussed, in his brief in support of his habeas application, Petitioner raises several new claims of ineffective assistance of counsel.  Petitioner argues that counsel failed to investigate the absence of corroborating evidence of the sexual assault on Ms. Hinesley.  He also argues that defense counsel failed to object to the prosecutorial misconduct of admitting the testimony of Ms. Hinesley as evidence of other bad acts showing a common plan or scheme. Further, he contends that defense counsel failed to hire an expert witness who would say that, if Petitioner had engaged in penile-vaginal penetration, his DNA likely would have been found on her labia and vagina.  In addition, Petitioner claims that defense counsel failed to introduce racially charged hearsay statements allegedly made by Hitchcock on the night of the incident and the following day about the victim having sex with a black man.  The new claims of ineffective assistance of counsel apparently were presented in Petitioner's amended motion for relief from judgment in the Allegan County Circuit Court, which was denied on October 25, 2017, long after Petitioner filed his habeas petition.  Petitioner, however, has not sought leave to appeal the denial of the motion in the state appellate courts.

Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts.  28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim.  *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971) (cited by *Duncan v. Henry*, 513 U.S. 364, 365 (1995) and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).  To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court.  *Duncan*, 513 U.S. at 365-66; *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 845.

Petitioner has not met his obligation to exhaust his new claims of ineffective assistance.  While he has presented the claims to the Allegan County Circuit Court, he has not sought leave to appeal the denial of his motion for relief from judgment to either the Michigan Court of Appeals or the Michigan Supreme Court.  Nevertheless, notwithstanding Petitioner's failure to exhaust his new claims of ineffective assistance of counsel, the Court may deny the unexhausted claims on the merits.  28 U.S.C. § 2254(b)(2).  Because the claims lack merit, the Court will address the new issues without requiring exhaustion at all levels of the state courts.

### 1.    failure to investigate

Petitioner argues that counsel failed to investigate the absence of corroborating evidence of the sexual assault of Ms. Hinesley.  It is well established that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular

23

investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate derives from counsel's basic function, which is "'to make the adversarial testing process work in the particular case.'" *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (quoting *Strickland,* 466 U.S. at 690). This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); accord *Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004). A purportedly strategic decision is not objectively reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) (cited in *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)).

Courts have not hesitated to find ineffective assistance in violation of the Sixth Amendment when counsel fails to conduct a reasonable investigation into one or more aspects of the case and when that failure prejudices his or her client. For example, in *Wiggins v. Smith*, 539 U.S. 510, 524-29 (2003), the Supreme Court held that the petitioner was entitled to a writ of habeas corpus because his counsel had failed to conduct a reasonable investigation into potentially mitigating evidence with respect to sentencing. *Id.* According to the Court, "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentence strategy impossible." *Id.* at 527-28. Consistent with *Wiggins*, the Sixth Circuit has held, in a variety of situations, that counsel's failure to investigate constituted ineffective assistance in violation of the Sixth Amendment. *See, e.g., Towns*, 395 F.3d at 258-59. (holding

24

that defense counsel's failure to investigate potentially important witness in robbery and felony murder trial was unreasonable, and thus constituted ineffective assistance, in violation of Sixth Amendment); *Combs*, 205 F.3d at 287-88 (holding that defense counsel was constitutionally ineffective for failing to investigate adequately his own expert witness, who testified that, despite the defendant's intoxication at the time of the crime, the defendant nevertheless was capable of forming the requisite intent to commit the crimes); *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992) (holding that counsel was constitutionally ineffective for failing to conduct an investigation into certain physical evidence that would have undermined the prosecution's theory that the victim was shot at a distance); *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) (holding that counsel's failure "to investigate a known and potentially important alibi witness" constituted ineffective assistance because "[c]ounsel did not make any attempt to investigate this known lead, nor did he even make a reasoned professional judgment that for some reason investigation was not necessary"); *see also Clinkscale*, 375 F.3d at 443 (collecting cases in which counsel's failure to investigate a potentially important witness constituted ineffective assistance).

Here, however, Petitioner provides no evidence – or even argument – of what counsel would have discovered by further investigation that he did not already know.  A court "cannot conclude that [] counsel was deficient solely on [the petitioner's] version." *See Fitchett v. Perry*, 644 F. App'x 485, 489 (6th Cir. 2016) (holding that "sheer speculation" of inadequate investigation does not state a claim).  "It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) (quoting *Strickland*, 466 U.S. at 689).  In addition, Petitioner's conclusory allegation that counsel failed to investigate Hinesley is belied by counsel's comprehensive cross-examination of Hinesley, which

demonstrated that counsel was fully aware of the circumstances underlying Hinesley's allegations and knew of the numerous contradictions between her police statements and her trial testimony. For both reasons, Petitioner utterly fails to demonstrate that defense counsel failed to investigate.

2.      failure to object to Hinesley's testimony

Petitioner argues that counsel should have objected to the admission of Hinesley's testimony.    Upon review, I conclude that Petitioner fails to overcome the presumption that counsel's decision to not file a motion to suppress or otherwise object to Hinesley's testimony was strategic.   Petitioner also fails to demonstrate that the admission of the testimony was improper and therefore fails to demonstrate that any objection by defense counsel would have been effective.

The record shows that the prosecutor properly filed a notice of intent to introduce Hinesley's testimony more than three months before trial.   (Cir. Ct. Register of Action, ECF No. 8-1, PageID.116.)   The court inquired about defense counsel's potential objections to the Rule 404(b) evidence at a pretrial hearing, and defense counsel initially expressed his intent to file a motion in limine to exclude the evidence in time to be heard at a scheduled hearing on the defense motion to suppress Petitioner's statement.   (*See* 3/8/12 Mot. Hr'g Tr., ECF No. 8-3, PageID.163-164 (advising court of intent to file a Rule 404(b) motion before the hearing on a defense motion to suppress Petitioner's statement)).   Defense counsel subsequently withdrew the motion to suppress Petitioner's statement, because review of the video of the interrogation revealed that Petitioner was properly advised of his rights.  (4/19/12 Mot. Hr'g Tr., ECF No. 8-4, PageID.178.) At that point, defense counsel also elected to not file a motion to exclude the 404(b) evidence. Thus, defense counsel unquestionably considered filing a motion to exclude Hinesley's testimony, but subsequently made a judgment not to do so.   The record therefore indicates that counsel's decision was strategic.

26

Petitioner presents no evidence to overcome the presumption of the reasonableness of counsel's strategic decision.  Michigan Rule of Evidence 404(b) permits the admission of other crimes, wrongs or acts, not to prove credibility, but to prove other purposes, such as "motive, opportunity, intent, preparation, scheme, plan, or system in doing an act . . . ."  *Id.*  In *People v. VanderVliet*, 508 N.W.2d 114, 126 (Mich. 1993), the Michigan Supreme Court identified the three-part standard for admitting evidence under Rule 404(b).  First, the evidence must be relevant to an issue other than propensity.  Second, the evidence must be relevant under Rule 402 to an issue or fact of consequence at trial.  Third, the trial court must balance whether, under Rule 403, the danger of unfair prejudice outweighs the probative value of the evidence.  *Id.*  In addition, a trial court may provide a limiting instruction to the jury.  *Id.*

In the instant case, the trial court admitted the evidence of Petitioner's alleged assault on Hinesley, but it carefully instructed the jury on how it could use the evidence:

> You have heard evidence that was introduced to show that the defendant committed improper acts for which he is not on trial. If you believe this evidence you must be very careful only to consider it for certain purposes. You may only think about whether this evidence tends to show that the defendant acted purposefully; that is, not by accident or mistake, or because he misjudged the situation, or that the defendant used a planned system or characteristic scheme that he has used before.

> You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the defendant is a bad person or that he is likely to commit crimes. You must not convict the defendant here because you think he is guilty of other bad conduct. All the evidence must convince you beyond a reasonable doubt that the defendant committed the alleged crimes or you must find him not guilty.

(T. Tr. III, ECF No. 8-9, PageID.831-832.)

The trial court's decision to admit the evidence constituted an application of state law that was fully supported by the underlying facts.  The circumstances of the plan or scheme described by Hinesley and Vissers were eerily parallel.  In both cases, Petitioner was supposed to

27

have left the premises, but remained inside without the knowledge of the other residents.  The women thought they were alone and were asleep and under the influence of either medication or alcohol.  They both woke later to find Petitioner engaged in penile-vaginal penetration with them.  When they objected, Petitioner apologized and stopped.  As the trial court held at sentencing, the circumstances of the two events demonstrated that Petitioner engaged in the same pattern of behavior with the two women, lingering after he had been asked to leave and taking advantage of the women when they were unable to consent.  (Sentencing Tr., ECF No. 8-12, PageID.883-884.)  The trial court's analysis at sentencing demonstrates that the court would have denied any motion to exclude Hinesley's evidence.  As a result, any motion to exclude her testimony would have been futile.  An attorney's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel.  *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000).

Moreover, although barred by state law, there exists no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process.  *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n.5.  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  The Sixth Circuit has found

that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). As a result, defense counsel had no constitutional basis for excluding the evidence.

Thus, the trial court's decision that the evidence was admissible under state law is neither contrary to nor an unreasonable application of Supreme Court precedent. Because the evidence was properly admitted under state law, Petitioner cannot demonstrate that trial counsel was ineffective in failing to make an objection. As a consequence, Petitioner cannot show that his trial attorney rendered ineffective assistance of counsel when he decided not to object to Hinesley's testimony.

3.      failure to call an expert

Petitioner claims that his trial attorney should have called an expert witness who would have testified that Petitioner's DNA would have been expected to be found in the victim's vagina, if penile-vaginal penetration had occurred.

As the Supreme Court has recognized, counsel is not automatically compelled to call an expert witness for every prosecution witness that testifies. *Harrington*, 562 U.S. at 111. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict." *Id.* Neither *Strickland*, nor any other clearly established federal law, requires defense counsel to provide expert testimony when there are other reasonable method – like cross-examination – to represent a client.

Here, Petitioner utterly fails to demonstrate that an expert witness could have been found to testify in the manner Petitioner suggests. In fact, the prosecutor's expert on DNA, Ann

Hunt, testified that the absence of sperm is not indicative of whether penetration occurred.  (T. Tr. II, ECF No. 8-8, PageID.586-587.)  Hunt also testified that the degradation of such cells over time could prevent their being found.  (*Id.*, PageID.601.)  Petitioner presents no evidence that any reputable expert would have testified differently than Hunt.  He therefore fails to establish the necessary factual basis for finding that counsel was ineffective.

Moreover, defense counsel thoroughly cross-examined Hunt.  He managed to elicit numerous acknowledgements concerning the absence of seminal fluid and Petitioner's DNA in the labial-vaginal areas.  (*Id.*, PageID.596-597, 602-603.)  Petitioner's demand for hypothetical expert testimony wholly fails to overcome the presumption that counsel acted reasonably in relying on cross-examination to highlight the absence of corroborating evidence of penetration.

4.    failure to challenge racial bias

Petitioner argues that, when Jimmy Hitchcock found out that his mother had sex with Petitioner, he became upset, saying "I know you didn't have sex with this nigger[,] Mom." (Br. in Supp. of Pet., ECF No. 2, PageID.36.)  According to Petitioner, "the victim became defens[]ive and told her son no she did not have sex with him, he came in and took it while I was asleep."  (*Id.*)  Petitioner claims to have told his attorney about the "argument," and he claims that eight hours later, Jimmy Hitchcock called his mother, saying, "Have you called the cops on that nigger yet[?]"  (*Id.*, PageID.37.)  Petitioner contends that his trial attorney was ineffective when he failed to raise the victim's real reason for making the accusation – her son's upset with a white woman having had sex with a black man.

Even assuming that the claims made in Petitioner's brief are truthful, an assumption unsupported by record evidence or an affidavit, Petitioner cannot demonstrate that counsel was ineffective.  As previously discussed, to prove a claim of ineffective assistance of counsel, the

petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Strickland*, 466 U.S. at 689 (citing *Michel*, 350 U.S. at 101).  Here, that presumption is amply supported by the strategy Petitioner pursued at trial, which was to argue that every element was not proved, especially in light of the conflicting evidence.  (T. Tr. III, ECF No. 8-9, PageID.817-821.)  Counsel's strategy no doubt was influenced by the fact that Petitioner provided a statement to the police.  In that statement, Petitioner denied engaging in sexual intercourse with Vissers, saying that he had merely cuddled Vissers in a consensual manner. Counsel risked undermining Petitioner's own statement by arguing that Petitioner had actually engaged in sexual intercourse with Vissers so as to prove that Vissers was lying because her son disapproved of an interracial sexual relationship.  Moreover, the statement recited by Petitioner reinforced Vissers' testimony at trial, as Petitioner acknowledges that Vissers claimed that Petitioner "took" sex from her while she was asleep.  (Br. in Supp. of Pet., ECF No. 2, PageID.36.) Under the circumstances that existed at the time, trial counsel's decision to pursue the strategy he did was well within the "wide range of professionally competent assistance" mandated by the Constitution. *Strickland*, 466 U.S. at 690.

In sum, Petitioner's unexhausted claims of ineffective assistance of counsel fail to overcome the presumption that he received constitutionally sufficient representation from his trial attorney.

## II.    Ground II:  Improper Scoring of OV 11

In his second ground for habeas relief, Petitioner argues that his sentence was mis-scored under the Michigan Sentencing Guidelines.  Specifically, he contends that the second penetration should have been scored under Offense Variable (OV) 12, MICH. COMP. LAWS

§ 777.42, rather than OV 11, MICH. COMP. LAWS § 777.41.  He argues that the scoring would have

resulted in a lower minimum-sentence range.

The Michigan Court of Appeals rejected the claim, as follows:

Defendant next argues that the trial court misscored OV 11. We review the trial court's factual determination for clear error and the facts must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).

A trial court properly scores OV 11, criminal sexual penetration, at 25 points when "[o]ne criminal sexual penetration occurred." 777.41(1)(b).  A trial court cannot score "points for the 1 penetration that forms the basis of a first- or third-degree criminal sexual conduct offense," and should score "all sexual penetrations of the victim by the offender arising out of the sentencing offense." MCL 777.41(2)(a); MCL 777.41(2)(c).  "Something that 'aris[es] out of,' or springs from or results from something else, has a connective relationship, a cause and effect relationship, of more than an incidental sort with the event out of which it has arisen." *People v Johnson*, 474 Mich 96, 101; 712 NW2d 703 (2006). Penetrations are properly scored when they "occur[] at the same place, under the same set of circumstances, and during the same course of conduct."  *Johnson*, 474 Mich at 100, citing *People v Mutchie*, 251 Mich App 273, 276; 650 NW2d 733 (2002).  In this case, defendant was convicted of two counts of third-degree CSC.  Scoring the second count of penetration was proper.  MCL 777.41(2)(c), MCL 777.41(1)(b) and see *People v Cox*, 268 Mich App 440, 455-456; 709 NW2d 152 (2005).

We conclude that defendant's second act of penetration "ar[ose] out of the sentencing offense," MCL 777.41(2)(a), because approximately 2 to 2-1/2 hours after the first penetration, defendant committed the same act in the same location. The acts occurred within a relatively short time frame and the first act was halted only when the victim awoke.  After waiting for her to fall asleep again, defendant perpetrated the second act.  Thus, we find defendant's second act of penetration had "a connective relationship, a cause and effect relationship, of more than an incidental sort" with the first act and "occurred at the same place, under the same set of circumstances, and during the same course of conduct" as the first act. *Johnson*, 474 Mich at 100-101.

(Mich. Ct. App. Op., ECF No. 8-13, PageID.892-893.)

Claims concerning the improper scoring of sentencing guidelines are state-law

claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S.

370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls

within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th

Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas

relief); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines

establish only rules of state law). There is no constitutional right to individualized sentencing.

*Harmelin v. Michigan*, 501 U.S. 957, 995 (1991); *United States v. Thomas*, 49 F.3d 253, 261 (6th

Cir. 1995); *see also Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978). Moreover, a criminal defendant

has "no federal constitutional right to be sentenced within Michigan's guideline minimum sentence

recommendations." *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord Austin v.*

*Jackson*, 213 F.3d 298, 300 (6th Cir. 2000); *Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D.

Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987).

The court of appeals, applying Michigan sentencing law, rejected Petitioner's

claim. The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law,

including one announced on direct appeal of the challenged conviction, binds a federal court sitting

in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*

*v. Richey*, 546 U.S. 74, 76 (2005)). Petitioner's state-law sentencing claim therefore is not

reviewable in this habeas proceeding.

Moreover, Petitioner does not argue, much less demonstrate, that his sentence

violated the United States Constitution. Although state law errors generally are not reviewable in

a federal habeas proceeding, an alleged violation of state law "could, potentially, 'be sufficiently

egregious to amount to a denial of equal protection or of due process of law guaranteed by the

Fourteenth Amendment.'" *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003) (quoting *Pulley*

*v. Harris*, 465 U.S. 37, 50 (1984)); *see also Doyle*, 347 F. Supp. 2d at 485 (a habeas court "will

not set aside, on allegations of unfairness or an abuse of discretion, terms of a sentence that is

within state statutory limits unless the sentence is so disproportionate to the crime as to be completely arbitrary and shocking.") (citation omitted).  A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude."  *Roberts v. United States,* 445 U.S. 552, 556 (1980)); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948).  To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence.  *Tucker*, 404 U.S. at 447; *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984).    A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence.  *Tucker*, 404 U.S. at 447.

Petitioner's sentence clearly is neither arbitrary nor shocking.  Further, Petitioner does not even suggest that the facts found by the court at sentencing were either materially false or based on false information.  *Tucker*, 404 U.S. at 447.  Instead, Petitioner argues only that the court should have scored OV 11 differently under state law.  Such a claim clearly falls far short of the sort of egregious circumstances implicating due process.  The state court's rejection of Petitioner's claim was not based on an unreasonable determination of the facts and was neither contrary to nor an unreasonable application of established Supreme Court precedent.  28 U.S.C. § 2254(d).

## **Certificate of Appealability**

Unless a certificate of appealability is issued, an appeal of the denial of a habeas corpus petition may not be taken.  28 U.S.C. § 2253(c)(1).  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."   28 U.S.C.

§ 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists would not conclude that this Court's denial of Petitioner's claims is debatable or wrong.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).


Dated:  March 5, 2018                              /s/ Ray Kent
                                                   United States Magistrate Judge



**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).